No. 24-12774

In the

# United States Court of Appeals
## for the Eleventh Circuit

L.W., a minor child, by and through his mother and legal
guardian, Katie Ward,

*Plaintiff-Appellee,*

v.

Russel Carlson, in his official capacity as Commissioner of the
Georgia Department of Community Health,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:24-cv-01912-TWT — Thomas W. Thrash, Jr., *Senior Judge*

## BRIEF OF DEFENDANT-APPELLANT

Gary V. Stiner, Jr.
  *Special Ass't Attorney General*
Oldenburg Stiner, P.C.
2004 Commerce Dr. N. Ste. 200
Peachtree City, Georgia 30269
(770) 632-9500
gstiner@oldenburgstiner.com

Christopher M. Carr
  *Attorney General of Georgia*
Bryan K. Webb
  *Deputy Attorney General*
Jason S. Naunas
  *Senior Ass't Attorney General*
Michelle W. LeGrande
  *Senior Ass't Attorney General*
Joycelyn R. Curry
  *Ass't Attorney General*

Georgia Attorney General's Office
40 Capitol Square SW
Atlanta, Georgia 30334

*L.W. v. Carlson*, No. 24-12774

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Alliant Health Solutions f/k/a Georgia Medical Care Foundation

Carr, Christopher M., Attorney General, Counsel for Defendant-Appellant

Curry, Joycelyn, Assistant Attorney General, Counsel for Defendant-Appellant

Katie Ward, mother and legal guardian of L.W., a minor child, Plaintiff-Appellee

LeGrande, Michelle W., Senior Assistant Attorney General, Counsel for Defendant-Appellant

L.W., a minor child, Plaintiff-Appellee

Naunas, Jason, Senior Assistant Attorney General, Counsel for Defendant-Appellant

Norris, Joshua, Counsel for Plaintiff-Appellee

Stiner, Jr., Gary V., Special Assistant Attorney General, Counsel for Defendant-Appellant

Thrash, Jr., Honorable Thomas W., Senior United States District Judge, Northern District of Georgia

Ward, Katie, mother and legal guardian of L.W.

Webb, Bryan, Deputy Attorney General, Counsel for Defendant-Appellant

*L.W. v. Carlson*, No. 24-12774

/s/ *Gary V. Stiner, Jr.*
Gary V. Stiner, Jr.

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Commissioner Russel Carlson does not believe oral argument is necessary for this Court to expeditiously reverse the district court. The district court entered a preliminary injunction requiring the Commissioner to quintuple the number of skilled nursing hours provided for Plaintiff-Appellee L.W. That order was based on the deeply flawed notion that Georgia violated the Medicaid Act because it did not provide the precise number of skilled nursing hours requested by L.W.'s treating physician.

That holding is directly contrary to this Court's recent decision in *M.H. ex rel. Lynah v. Comm'r of the Dep't of Cmty. Health*, 111 F.4th 1301, 1308 (11th Cir. 2024), which reversed the same district court regarding a virtually identical issue. "[P]recedent does not require the [State] to defer to the recommendation of the treating physician." *Id.* The question is whether the State's *policy* (here, requiring some change in condition to justify a change in skilled nursing hours) is reasonable, *id.*, and it plainly is.

i

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ................................................. i

Table of Authorities ..................................................................... iv

Jurisdiction ............................................................................. viii

Statement of Issues ..................................................................... 1

Introduction ............................................................................. 2

Statement of the Case.................................................................. 5

    A. Statutory Background ........................................................... 5

    B. Factual Background .............................................................. 8

    C. Proceedings Below.............................................................. 11

    D. Standard of Review ............................................................. 13

Summary of Argument ................................................................. 14

Argument ................................................................................ 18

    I. The district court erred in granting a preliminary
       injunction that simply replaces the State's administrative
       processes with the court's policy views. ............................... 18

       A. L.W. is not likely to succeed on the merits. .................. 19

       B. L.W. will not suffer an irreparable injury without the
          injunction...................................................................... 33

       C. A preliminary injunction is adverse to the public
          interest......................................................................... 35

    II. The district court failed to consider whether, and to what
        extent, security was required under Rule 65(c). ................ 37

# TABLE OF CONTENTS
## (continued)

**Page**

Conclusion ........................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
   585 U.S. 579 (2018) .................................................................. 36

*Ass'n of Gen. Contractors,*
   896 F.2d 1284 ........................................................................ 33

*Beal v. Doe,*
   432 U.S. 438 (1977) ........................................................3, 19, 21

*Bellsouth Telecomms., Inc. v. MCImetro Access*
   *Transmissions Servs., LLC,*
   425 F.3d 964 (11th Cir. 2005) .................................................. 37

*Cable Holdings of Battlefield, Inc. v. Cooke,*
   764 F.2d 1466 (11th Cir. 1985) ................................................ 34

*Carr v. Saul,*
   593 U.S. 83 (2021) .................................................................. 31

*Cox Enters., Inc.,*
   510 F.3d at 1360 ..................................................................... 38

*Dreams Defs. V. Governor of Fla.,*
   119 F.4th 872 (11th Cir. 2024)............................................ 5, 13

*FDIC v. Scott,*
   125 F.3d 254 (5th Cir. 1997) .................................................... 32

*Gonzales v. Governor of Ga.,*
   978 F.3d 1266 (11th Cir. 2020) ...........................................15, 18

*Linfors v. United States,*
    673 F.2d 332 (11th Cir. 1982) ................................................... 32

*M.H. ex rel. Lynah v. Comm'r of the Dep't of Cmty.*
    *Health*
    111 F.4th 1301, 1308 (11th Cir. 2024) ..............................*passim*

*Maryland v. King,*
    567 U.S. 1301 (2012) ..........................................................17, 36

*Moore v. Reese,*
    637 F.3d 1220 (11th Cir. 2011) ....................................3, 6, 22, 26

*Ne. Fla. Chapter of Ass'n of Gen. Contractors v.*
    *Jacksonville,*
    896 F.2d 1283 (11th Cir. 1990) ................................................. 16

*Robinson v. Att'y Gen. of Ala.,*
    957 F.3d 1171 (11th Cir. 2020) ................................................. 14

*S.D. v. Hood,*
    391 F.3d 581 (5th Cir. 2004) ..................................................... 6

*Sandoz Inc. v. Becerra,*
    57 F.4th 272 (D.C. Cir. 2023) ................................................... 32

*Transcon. Gas Pipe Line Co. v. 6.04 Acres,*
    910 F.3d 1130 (11th Cir. 2018) ................................................. 14

*United States v. Jefferson County,*
    720 F.2d 1511 (11th Cir. 1983) ................................................. 33

## Statutes

28 U.S.C. § 1331 ............................................................................. vi

28 U.S.C. § 1292 (a)(1) ...................................................................... vi

42 U.S.C. § 1396. ................................................................... vi, 5, 11

42 U.S.C. § 1396(a) & (b) ................................................................. 6

42 U.S.C. § 1396a(a)(5) ..................................................................... 5

42 U.S.C. § 1396a(3) ..............................................................16, 31, 33

42 U.S.C. § 1396d(r) ................................................................... 6, 12

42 U.S.C. § 1983 .................................................................. vi, 5, 11

O.C.G.A. § 49-4-142 .......................................................................... 5

O.C.G.A. § 49-4-153 (b)(1) ............................................................... 32

## Other Authorities

2 C.F.R. § 456 ..................................................................................... 7

42 C.F.R. § 431.10 ............................................................................. 5

EPSDT: A Guide for States: Coverage in the Medicaid
Benefit for Children and Adolescents (June 2014)
https://www/medicaid.gov/sites/default/files/2019-
12/epsdt_coverage_guide.pdf ...................................................... 7

Federal Rule of Civil Procedure 59(a)(2) ...................................... 37

Federal Rule of Civil Procedure 65(c) ...................................... 13, 17

Federal Rule of Civil Procedure 65(d) ........................................... 37

Ga. Comp. R. & Regs. § 616-1-2-.01, et seq. ................................. 32

https://www.fox5atlanta.com/news/georgia-grapples-
with-nations-second-worst-nursing-shortage ........................... 28

Part II, Policies and Procedures for GAPP for In-Home
    Nursing, Section 803.1B
    https://www.mmis.georgia.gov/portal/Default.aspx?t
    abid=18 ...................................................................................... 11

United States Constitution............................................................. 11

## JURISDICTION

The district court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellee L.W., by and through his mother and legal guardian Katie Ward, brought a civil action under 42 U.S.C. § 1983 for alleged violations of the Medicaid Act, 42 U.S.C. § 1396 *et seq*.

This court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court granted preliminary injunctive relief.

This appeal is timely because the preliminary injunction was granted on July 30, 2024, *see* Doc. 13, and the Commissioner filed a notice of appeal on August 28, 2024, *see* Doc. 18.

## STATEMENT OF ISSUES

1.    Whether the district court abused its discretion when it preliminarily enjoined the Georgia Department of Community Health Commissioner from applying a policy of conditioning an increase in skilled nursing hours on a change in the patient's condition or a new medical need.

2.    Whether the district court abused its discretion by failing to consider whether Plaintiff-Appellee must give security, as required by Federal Rule of Civil Procedure 65(c), before granting a preliminary injunction.

## INTRODUCTION

This case asks whether Georgia violates the Medicaid Act by requiring a justification—either a change in the patient's condition or a new medical condition—before it will increase previously authorized skilled nursing hours under its Medicaid program.  To ask the question is to answer it.  Georgia's requirement is not only a "reasonable standard" that falls squarely within its "broad discretion" to administer its Medicaid program, it is a common-sense way to wisely steward public funds. *M.H. ex rel. Lynah v. Comm'r of the Dep't of Cmty. Health*, 111 F.4th 1301, 1308 (11th Cir. 2024).

Nevertheless, the district court, via preliminary injunction, ordered the Commissioner of Georgia's Department of Community Health (Defendant-Appellant) to nearly quintuple the skilled nursing hours Georgia provides L.W. (Plaintiff-Appellee) based solely on his treating physician's new, unsupported recommendation.  Doc. 13 at 11.  That is not how the law works. The Medicaid Act does not (and cannot) determine the number of skilled nursing hours L.W. must receive, and this Court's "precedent does not require the [State] to defer to the recommendation of the treating physician." *M.H.*, 111 F.4th at 1309.  Instead, "[t]he only issue before [the Court] is the

2

sufficiency of" Georgia's process, *id.* at 1310, and a policy of requiring some justification to increase previously approved hours is undoubtedly "reasonable and consistent with the objectives of the [Medicaid] Act," *Beal v. Doe*, 432 U.S. 438, 444 (1977) (quotation omitted).

Under the Medicaid Act, States must "correct or ameliorate" certain "defects and physical and mental illnesses" discovered in eligible individuals under the age of 21. 42 U.S.C. § 1396d(r)(5). States have discretion to determine how to satisfy these requirements within the bounds of medical necessity, as established by federal regulations and guidance. *See Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1238 (11th Cir. 2011).

Georgia's Department of Community Health contracts with Alliant Health Solutions to operate the State's Medicaid program, and Alliant determined that 21 hours of at-home skilled nursing per week were medically necessary for L.W., based on his conditions and documentation from his treating physicians. When L.W.'s mother, Katie Ward, later sought to increase L.W.'s authorized weekly hours to 100, Alliant denied the request because the request did not state a change in L.W.'s status or a new medical condition that warranted additional skilled nursing care, as required by policy. Ward then sued the Department on

3

L.W.'s behalf, alleging Alliant's denial violated the Medicaid Act, and moved for a preliminary injunction to compel the five-fold increase in skilled nursing hours that she sought.

Despite the lack of evidence of increased medical necessity, the district court granted Ward's motion for a preliminary injunction. The court enjoined the Department from reducing L.W.'s skilled nursing hours below 100 hours per week and required the Department to consider L.W.'s parents' capacity—including work, sleep, and caring for other dependents—alongside L.W.'s medical condition.

The injunction fundamentally misapplied the Medicaid Act. Federal courts are not the appropriate forum for every administrative disagreement, and here the district court should have quickly and easily rejected L.W.'s suit. But instead of evaluating the legal sufficiency of Alliant's *processes*, the district court made itself the de facto administrator of Georgia's Medicaid program, concluding that L.W. was entitled to 100 hours of skilled nursing care per week because his treating physician's recommendation was "credible." Doc. 13 at 4. This approach—where a federal court simply decides that the State must follow *any* treating physician recommendation—is precisely what this Court recently rejected in *M.H.* That case clarified that Alliant

was not required "to defer to the recommendation of [L.W.'s] treating physician," and that the "sufficiency" of Alliant's processes is all that is at issue. *M.H.*, 111 F.4th at 1309–10. Because the district court misapplied the law, it abused its discretion and the preliminary injunction should be vacated. *See Dream Defs. v. Governor of Fla.*, 119 F.4th 872, 876 (11th Cir. 2024).

## STATEMENT OF THE CASE

L.W.'s complaint asserts three claims under 42 U.S.C. § 1983 based on alleged violations of the Medicaid Act. Doc. 1. Contemporaneous with the complaint, Ward moved for a temporary restraining order and preliminary injunction, Doc. 2, which the district court granted, Doc. 13.

### A. Statutory Background

Under the Medicaid Act, the federal government provides financial assistance to states to enable them to provide various medical services. *See* 42 U.S.C. § 1396. The Department of Community Health is the single state agency responsible for administering Medicaid in Georgia. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; O.C.G.A. § 49-4-142. The U.S. Department of Health and Human Services' Centers for Medicaid and Medicare

5

Services approved Georgia's Medicaid plan. *See* 42 U.S.C. § 1396a(a) & (b).

Federal Medicaid regulations require each state to provide early and periodic screening, diagnostic, and treatment services as a mandatory category of medical assistance for qualified individuals. *See* 42 U.S.C. § 1396d(r). This is Medicaid's comprehensive and preventive child health program for individuals under the age of 21, and it is defined to include "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in section 1905(a) … to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id.*; *see also S.D. v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004).

Participating states must provide medically necessary early and periodic screening, diagnostic, and treatment services to eligible children. However, "the statute and regulations afford [states] discretion as to how to do so." *Moore v. Reese*, 637 F.3d 1220, 1238 (11th Cir. 2011) (*quoting Katie A. ex rel. Ludin v. Los Angeles*, 481 F.3d 1150, 1159 (9th Cir. 2007)). The Centers for Medicare and Medicaid Services has issued guidance providing that when medical professionals associated with a Medicaid

6

program disagree with a child's medical professional, the state should implement *its own* expert's decision and allow the child to seek review in an administrative hearing. *See EPSDT – A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* (June 2014).[1]

Georgia offers early and periodic screening, diagnostic, and treatment skilled nursing services through the Georgia Pediatric Program, which provides skilled in-home nursing services (among other services) for medically fragile children. Doc. 6 at 3. Georgia Pediatric Program skilled nursing services are intended to provide care based upon medical necessity; the services are not intended for the convenience or comfort of caregivers or family members. Doc. 6 at 3.

The Department contracts with Alliant Health Solutions for utilization review for requested services under the Georgia Pediatric Program.[2] Doc. 6 at 3. Alliant reviews physician requests for initial services and change requests for existing

---

[1] The guide is publicly available and may be accessed here: https://www.medicaid.gov/sites/default/files/2019-12/epsdt_coverage_guide.pdf

[2] Utilization review is required by the Medicaid Act for certain categories of service. *See* 42 U.S.C. § 1396r-8(d); 2 C.F.R. § 456.

services to determine whether the services or the change requested are medically necessary.  Doc. 6 at 3.

## B.  Factual Background

L.W. is a Medicaid recipient and Georgia Pediatric Program participant with certain skilled nursing needs paid for by the Department.  *See generally* Doc. 6 at 4.  Following a determination of medical necessity, in June 2023 Alliant authorized L.W. to receive 21 hours per week of skilled nursing services.  Doc. 6 at 4.  L.W. received the 21 hours of in-home skilled nursing care approved for more than one year prior to the district court's order of July 30, 2024.  *See generally* Doc. 6 at 4.

In December 2023, Ward (L.W.'s mother) submitted a request for renewal, which sought to maintain the 21 hours previously authorized.  Doc. 6 at 4.  As there was no change in L.W.'s condition, the renewal was approved at 21 hours on or about December 27, 2023.  Doc. 6 at 4.  The renewal authorized services for the period January 1, 2024, through December 31, 2024.  Doc. 6 at 4.  Later in January 2024, Ward requested reconsideration. Doc. 6 at 4.  Because the December 2023 renewal request for 21 hours per week was *approved*, meaning there was no adverse action, the request for reconsideration was denied.  Doc. 6 at 4.

On or about January 30, 2024, the Georgia Pediatric Program received a change request seeking to increase L.W.'s skilled nursing hours from 21 per week to 40 per week.  Doc. 6 at 5. Included with the change request was, among other documents, an undated letter of Dr. Neena Champaigne opining that "[L.W.'s] home nursing needs are 40 hours per week."  Doc. 6-1 at ¶ 8; *see also* Doc. 6-1 at 9.

The change request from 21 hours per week to 40 hours per week was denied because no change in L.W.'s condition had been indicated in the documents provided, including Dr. Champaigne's undated opinion letter.  Doc. 6 at 5.  L.W. remained medically stable with 21 hours per week of skilled nursing services provided since June 2023.  Doc. 6 at 5.

Dissatisfied with this result, Ward submitted yet another change request seeking to increase the number of skilled nursing hours provided from 21 per week to 100 per week, a nearly five-fold increase in services.  Doc. 6 at 5.  The request included another undated, though slightly revised, opinion letter from Dr. Champaigne.  Doc. 6 at 5.  To support her new recommendation for an increase to 100 hours per week, Dr. Champaigne speculated about the potential risk of a missed feeding should a caregiver sleep past an alarm, plus concern for L.W.'s parents' ability to

maintain their 50+ hour workweeks if they do not get sufficient sleep and support. Doc. 2-2 at 6; 2-3 at 2. Once again, Dr. Champaigne's recommendation did not mention any change in L.W.'s condition.

Ward requested an increase in L.W.'s skilled nursing hours—from 21 hours to 100 hours—on or about March 6, 2024. Doc. 1 at ¶ 5. After reviewing the change request and Dr. Champaigne's most recent opinion letter, Doc. 6-1 at 11-12, Alliant denied the change request on April 12, 2024. Doc. 2-4.

Alliant's denial was primarily due to Ward's ongoing failure to identify *any* change in L.W.'s condition that would warrant an increase in skilled nursing hours, much less a five-fold increase to 100 hours per week. *See generally* Doc. 6 at 7. Alliant explained that "[t]here were no new medically necessary skilled nursing needs noted in the documentation." Doc. 6 at 7. But most importantly, L.W.'s condition remained stable with the 21 hours of skilled nursing care that had been authorized. Doc. 6-1, ¶¶ 9, 13.

Because L.W.'s condition had not changed, Alliant denied the change request based on Section 803.1B of "Part II, Policies and Procedures for Georgia Pediatric Program (GAPP) for In-Home

Nursing" (the "Manual").  Doc. 6-1 at 6-7, ¶ 14.[3]  Section 803.1B
provides that change requests must include some indication that a
change in the member's condition has occurred together with
signed and dated physician's orders, a physician plan of treatment
discharge summary, or progress notes where the change request,
as here, seeks an increase in hours.  Change requests that do not
properly document the reason for the requested change cannot be
considered.[4]  Doc. 6-1 at 6-7, ¶ 14.

### C.  Proceedings Below

Ward filed a complaint on L.W.'s behalf on May 1, 2024.  Doc.
1.  The complaint relies on 42 U.S.C. § 1983 and alleges violations
of the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, and the U.S.
Constitution.  Ward contends that the Department failed to
provide sufficient private duty nursing services necessary to
"correct or ameliorate" L.W.'s condition as required by the early

---

[3] The Manual is publicly available and may be accessed here:
https://www.mmis.georgia.gov/portal/Default.aspx?tabid=18.

[4] The Department disputes that Dr. Champaigne's undated letter
of opinion meets the minimum requirements of Section 803.1B of
the Manual in any regard.  In particular, the letter fails to
identify any change in condition to support the change request,
the letter is a mere statement of opinion (not an order), and it is
undated.

and periodic screening, diagnostic, and treatment provisions of the Medicaid Act. 42 U.S.C. § 1396d(r). The complaint seeks declaratory and injunctive relief requiring the Department to authorize and provide 100 hours of skilled nursing hours per week instead of the currently authorized 21 hours per week. Doc. 1 at 36–40.

Ward moved for a temporary restraining order and preliminary injunction on the same day the complaint was filed. *See* Doc. 2. Dr. Champaigne submitted an affidavit in support of the motion, stating her belief that 21 hours of nursing is "insufficient," Doc. 2-2 at 6, ¶ 10, and seeking to clarify that her initial recommendation for 40 hours per week (as opposed to the subsequent request for 100 hours per week) was based on her "understanding of what the [Georgia Pediatric] program would approve and L.W.'s mother's need for nursing hours so she could work," not on what is medically necessary for L.W. Doc. 7-1 at 4, ¶ 7.

After a hearing, the district court granted Ward's motion and entered an order ruling as follows:

- Defendant is enjoined from reducing L.W.'s private duty nursing hours below 100 hours per week.

- Defendant is enjoined from applying to L.W.'s requests for private duty nursing services a policy that will not permit consideration of requests to increase nursing hours without a demonstrated change in condition or new skilled nursing care need.

- Defendant is enjoined from evaluating L.W.'s requests for prior authorization of private duty nursing services without considering the competency and capacity of his parents to provide skilled care for him and taking into account their unavailability or inability to provide care due to work, sleep, care for other dependents, illness, or disability.

Doc. 13 at 11.

The district court's order failed to require that Ward provide security as required by Federal Rule of Civil Procedure 65(c) and contained no discussion of the issue.

### D.   Standard of Review

This Court "review[s] the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error." *Dream Defs.*, 119 F.4th at 876.

This Court reviews "[d]ecisions regarding the security required to be posted in connection with the issuance of a preliminary injunction" for abuse of discretion. *Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1171 (11th Cir. 2018).

## SUMMARY OF ARGUMENT

The district court acted well outside of its authority in demanding a five-fold increase in skilled nursing hours for L.W., and this Court should reverse. Medicaid standards require the Department to provide services only to the extent medically necessary to "correct or ameliorate" a patient's condition or illness, and this Court's precedent confirms that state agencies are not obligated to adopt a treating physician's preferred care plan when it has determined a lower level of services sufficiently meets the patient's needs. Here, 21 hours per week sufficiently ameliorated L.W.'s condition, and the district court's preliminary injunction is based entirely on the district court's mistaken view of L.W. needs, not any legal infirmity in the State's processes. If that were not clear before—and it already was—this Court's decision in *M.H.* ends any doubt.

A preliminary injunction is appropriate when the moving party shows: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction

is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzales v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). Here, each factor cuts against the district court's injunction.

First, L.W. is certain to lose on the merits. Medicaid is not a blank check—not everyone is eligible, and States must provide only covered services that are "medically necessary." *M.H.*, 111 F.4th at 1304 (quotation omitted). Moreover, this Court's "precedent does not require the [State] to defer to the recommendation of the treating physician," and "the only issue … is the sufficiency of" the State's process. *Id.* at 1309, 1310. The preliminary injunction here is squarely at odds with *M.H.*, in which this Court reversed the same district court's grant of summary judgment for a plaintiff who challenged how the Department determines the number of skilled nursing hours a patient receives in the first instance, and *M.H.* makes the preliminary injunction here untenable.

In Georgia, a Medicaid recipient's request for increased skilled nursing assistance "must include some indication that a change in the [patient's] condition has occurred." Doc. 6 at 8. Ward has not even attempted to explain why this obviously

15

reasonable policy—requiring justification for increased skilled nursing hours—is unreasonable.  Instead, she ignores L.W.'s medical condition altogether and focuses on *her* needs as L.W.'s caregiver.  But the Medicaid Act's "medical necessity" standard explicitly provides that covered services are those that "correct or ameliorate a *patient's* illness and condition," and the Department's process is consistent with this aim.  *M.H.*, 111 F.4th at 1308 (emphasis added) (alteration accepted) (quotation omitted).  And on top of that, Ward was required to present her claim in the State's administrative process (which the Medicaid Act requires the State to provide) before going straight to federal court.  *See* 42 U.S.C. § 1396a(3).  The district court did not have the authority to enter this order, and it is not a close question.

Next, the preliminary injunction does not prevent L.W. from experiencing an irreparable injury.  A preliminary injunction's purpose is to maintain the status quo.  *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990).  Here, L.W. received 21 hours of care per week for more than one year before the district court's order, and his condition remained stable during that time.  Doc. 6-1 at ¶¶ 9, 13.  The preliminary injunction bypassed the legal process by which

questions of law and fact should be resolved and dramatically disrupted the status quo in so doing.

Plus, the preliminary injunction is adverse to the public interest. It misapplies the law and harms the State by imposing extralegal requirements on its administration of a complex Medicaid scheme. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)).

Finally, the district court also abused its discretion by failing to consider the requirement for security when it issued the preliminary injunction. Federal Rule of Civil Procedure 65(c) mandates that courts issuing injunctions consider security to protect against potential losses by a wrongfully enjoined party. Although this Court allows the district court discretion to waive security, the court may not simply *disregard* the issue. Here, the district court ignored both the Department's specific request for security and the expected cost to the state without making any findings of fact to justify the omission. It therefore abused its discretion, as it leaves no basis for appellate review and fails to consider the Department's interests.

In sum, the injunction should be vacated, and the case should be remanded with instruction to dismiss the complaint.

## ARGUMENT

### I. The district court erred in granting a preliminary injunction that simply replaces the State's administrative processes with the court's policy views.

A preliminary injunction is appropriate when the moving party shows: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzales*, 978 F.3d at 1270–71. Likelihood of success on the merits is "generally the most important of the four factors," *id.* at 1271 n.12 (quotation omitted), and "[t]he third and fourth factors merge when, as here, the government is the opposing party," *id.* at 1271 (quotation omitted) (alteration accepted). Here, *every* factor cuts against the district court's injunction, especially the most important: L.W. will not succeed on the merits, and the district court held otherwise only by relying on plain legal errors.

### A.  L.W. is not likely to succeed on the merits.

The Medicaid Act requires states "to provide private nursing services to … patients only if the services are medically necessary," and permits states to "set reasonable standards" for determining what constitutes a "medical necessity." *M.H.*, 111 F.4th at 1308.  And the Supreme Court has made clear that states have "broad discretion" to determine how much assistance to provide, so long as their standards are "reasonable and consistent with the objectives of the [Medicaid] Act." *Beal*, 432 U.S. at 444 (quotation omitted).

The Department is permitted to set "reasonable standards for the terms 'necessary' and 'medical necessity' … and has 'broad discretion … to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives of' the Act.'" *M.H.*, 111 F.4th at 1309.  Private duty nursing services must therefore be "'sufficient in amount, duration, and scope to reasonably achieve its purpose,' that is, to 'correct or ameliorate' a patient's condition." *Id*.

**1.** The initial question here is not whether a court agrees or disagrees with a particular physician's recommendation; it is whether Georgia's policy is reasonable.  That policy requires "some

indication that a change in the [patient's] condition has occurred" to change an already-approved number of skilled nursing hours. Doc. 6 at 8. *Of course* that is a "reasonable" policy.

The facts of this case demonstrate the reasonableness of the State's policy. Alliant authorized 21 hours of in-home skilled nursing care for L.W. based on his medical needs. Doc. 6 at 4. It is surely "reasonable" for Alliant to require that someone explain "what changed?" before increasing this number. If 21 hours were insufficient, it would have shown up in some deleterious change to L.W.'s condition. At the very least, a physician should be able to identify *some* reason for the change. Without a reason, changing from 21 to some other number of others is, by definition, arbitrary.

The district court disagreed based on policy views, not the law. The district court relied on input from L.W.'s treating physician, which the court found "credible." Doc. 13 at 4. But whether L.W.'s physician was credible or even correct is beside the point. This Court's "precedent does not require the [State] to defer to the recommendation of the treating physician," and "the only issue … is the sufficiency of" Alliant's process. *M.H.*, 111 F.4th at 1309, 1310. Here, Ward has not even attempted to explain why Alliant's obviously reasonable policy of requiring justification for increased skilled nursing hours is unreasonable. Nor has she

alleged at any point that the increased care she seeks is due to a change in L.W.'s medical condition. *See generally* Doc. 1; 2-2; 2-3; 6-1 at 9, 11–12.

To the contrary, Ward was honest about the actual reason for the change requested: *her* schedule. In her declaration, Ward explained: "I spoke with Dr. Champaigne about L.W.'s current nursing hours and explained that *I* needed an increase in nursing hours *so I could continue to work*. Dr. Champaigne then prepared a letter recommending an increase in L.W.'s nursing hours." Doc. 7-2 at 7, ¶ 13 (emphases added). But Medicaid is not a daycare service, and the relevant legal issue is whether the Department's processes are sufficient for the *patient*. *See M.H.*, 111 F.4th at 1310. The State's requirement that increased coverage must depend on a change in the *patient's* status is plainly "reasonable and consistent with the objectives of the [Medicaid] Act." *Beal*, 432 U.S. at 444 (quotation omitted).

More generally, States have "broad discretion" to determine how much assistance is provided under Medicaid, and the district court plainly erred when it declared Georgia's processes invalid simply because it agreed with L.W.'s treating physician about increased services. *Id.* The district court's injunction requires the Department to consider non-medical matters such as a patient's

parents' work schedules, sleep patterns, and other activities when determining the appropriate level of skilled nursing hours. But the district court had no authority to replace Georgia's legally "sufficient" process with a process it deemed superior. *M.H.*, 111 F.4th at 1309.

The district court's preliminary injunction came less than two weeks before this Court decided *M.H.*, in which it was determined that Georgia's "provision of skilled nursing for severely disabled children," including how Alliant determines the "presumptive range of skilled nursing hours that the patient should receive each week" and its "practice of reducing the hours of skilled nursing as a patient's caregiver learns to perform skilled tasks," complies with the Medicaid Act. *Id.* at 1304. *M.H.* made clear that a state "may place appropriate limits on a service based on … medical necessity." 111 F.4th at 1309 (*citing* 42 C.F.R. § 440.230(d)).

In other words, a private physician's opinions and recommendations regarding medical necessity are not dispositive. *Moore*, 637 F.3d at 1255. The State is not required to provide whatever is considered ideal by a treating physician—or, for that matter, by a district judge. Those opinions may shift week to week on the same facts; the state "may still review the medical necessity of the amount of nursing care prescribed by the treating

22

physician and make its own determination of medical necessity."
*Id.* at 1257 (citations omitted). Because L.W.'s condition had not
changed, the Department reasonably determined that the 21
hours provided were sufficient. The district court's conclusion
that Dr. Champaigne's opinions and recommendation for 100
hours per week should trump the Department's determination
cannot be squared with what this Court held in *M.H.* and *Moore*.

And although it might be tempting to do just as the district
court did—impose extralegal requirements to help a few parents
with work commitments and the like—that comes with real costs.
Resources are limited. Skilled nursing hours for one child means
fewer available for others. Justifiable compassion for families in
difficult circumstances should not blind courts to the actual legal
standards involved, which protect not only the patient in this case
but all the other patients who rely on Medicaid services.

The Department authorized and provided private-duty
nursing services that were manifestly sufficient in amount,
duration, and scope to reasonably achieve the purpose of
correcting or ameliorating L.W.'s condition as evidenced by the
fact that L.W.'s condition did not deteriorate over a long period of
time. The district court's injunction requiring the Department to
consider a change in skilled nursing hours regardless of a change

in L.W.'s condition or need is patently contrary to the Medicaid Act, early and periodic screening, diagnostic, and treatment standards, policy guidance issued by the Centers for Medicare and Medicaid Services, and this Court's precedents. Indeed, it is difficult to comprehend how the delivery of additional skilled nursing services can be deemed "medically necessary" where there is no change in the patient's condition or demonstrated need for additional services. *M.H.*, 111 F.4th at 1310.

This Court's review could stop there, but the district court also clearly erred in several of its factual determinations. For instance, the district court found that the Department "offer[ed] no evidence" to support its contention that 21 hours per week was the amount medically necessary to correct or ameliorate L.W.'s condition. Doc. 13 at 6-7. That makes no sense. As shown by the record, the Department submitted the affidavit of the Alliant Pediatric Review Nurse participating in the review of L.W.'s change requests and affirming that 21 hours per week of skilled nursing services is "the number of skilled nursing hours per week medically necessary to correct or ameliorate" L.W.'s condition. Doc. 6-1 at ¶ 13. The district court's finding that *no evidence* was offered is clearly erroneous.

24

Also clearly erroneous is the district court's finding that the Department "offer[ed] no evidence" to show that "Dr. Champaigne's recommendation of 100 per week is not based on medical necessity." Doc. 13 at 6-7. Again, the Department has no evidentiary burden here, and the Court need not reach this question, but the record is replete with such evidence. It includes Dr. Champaigne's various opinion letters and declarations, which are internally inconsistent. *See* Docs. 2-2, 2-3, 7-1. Meanwhile, Ward declared that she told Dr. Champaigne that *she* needed an increase in nursing hours so *she* could work. Doc. 7-2 at 7. Dr. Champaigne obliged and prepared a letter requesting an initial increase in L.W.'s nursing hours to 40 hours per week. Doc. 7-2 at 7, ¶ 13. In an effort to explain increasing her recommendation from 40 hours per week to 100 hours per week a few short weeks later, Dr. Champaigne stated that she only recommended 40 hours based on an "understanding of what the GAPP program would approve" and L.W.'s "*mother's need*" for nursing hours "so she could work," and not based on what is medically necessary. Doc. 7-1 at 5, ¶ 7 (emphasis added). Dr. Champaigne recommended 100 hours citing, among other concerns, a worry for L.W.'s parents' ability to maintain their long work hours and sleep schedules. Doc. 2-2 at 6, ¶ 9; Doc. 2-3 at 2. The district court's

finding that there is no evidence to show that Dr. Champaigne's opinions are based on something other than medical necessity is clearly erroneous.

**2.** The district court also improperly enjoined the Department from evaluating Ward's requests for private duty nursing services without considering the "competency and capacity" of L.W.'s parents to provide skilled care for him, taking into account their unavailability or inability to provide care due to "work, sleep, care for other dependents, illness, or disability." Doc. 13 at 11. This is a critical issue since the district court's order requires the Department to make determinations of medical necessity based on non-medical factors that center on the needs of a patient's caregivers and others, including L.W.'s parents' other unidentified dependents.

The Medicaid Act requires the Department to provide private nursing services to patients only if the services are *medically necessary*. *M.H.*, F.4th at 1308. The Department "is not required to provide medically *unnecessary*, albeit desirable, [early and periodic screening, diagnostic, and treatment] services." *Moore*, 637 F.3d at 1255. In determining the number of skilled nursing hours to provide, "the question is whether the *patients* reasonably require those services to correct or ameliorate their conditions."

26

*M.H.*, 111 F.4th at 1311 (emphasis added). The focus is squarely on the patients' needs and not on the needs or convenience of caregivers or others. Again, the services must be "sufficient in amount, duration, and scope to reasonably achieve [their] purpose." *Id.* at 1308-1309 (quoting 42 C.F.R. § 440.230(b)). As L.W.'s condition was ameliorated with 21 hours of private duty nursing per week, the services provided were indisputably sufficient in amount, duration, and scope to meet his needs. There is no requirement or need to engage in additional considerations that focus on caregivers' careers, personal pursuits, or the needs of others.

As discussed *supra*, the Department considers caregiver competency in making its determinations. This Court in *M.H.* expressly approved the Department's practice of reducing the number of skilled nursing hours for patients over time as caregivers gain competency by learning skilled tasks. 111 F.4th at 1310–11. The Court held that it was reasonable for the Department to "give priority to patients who lacked trained caregivers over patients with trained caregivers." *Id.* at 1310. It also recognized that the Department is under a mandate to provide such methods and procedures relating to the utilization of Medicaid services "as may be necessary to safeguard against

27

unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care." *Id.* at 1311.

The Department need not somehow take into account caregivers' *work* commitments and other pursuits when considering the services medically necessary to correct or ameliorate a patient's illness or condition. Determinations regarding what services may be medically necessary to treat an illness or condition cannot depend on non-medical considerations of caregivers' work and sleep schedules, avocations, or other activities related to career or lifestyle, nor can the determinations be based on the needs of others even further removed. Nothing in the Medicaid Act requires the Department to engage in those kinds of inquiries and assessments.

The Department's resources are limited, and the availability of skilled private-duty nursing services is particularly constrained, a fact widely reported in the news media.[5] The district court's injunction necessarily requires the Department to prioritize patients whose trained caregivers have demanding careers (by

---

[5] *See generally* https://www.fox5atlanta.com/news/georgia-grapples-with-nations-second-worst-nursing-shortage

28

choice or necessity) or participate in time-consuming avocations outside the home over those who lack trained caregivers.[6]

Notably, the district court also imposed a series of extralegal, "other" considerations on the Department to include caregivers' unavailability or inability due to "work, sleep, care for other dependents, illness, or disability."  Doc. 13 at 11.  Those considerations are inconsistent with a determination of "medical necessity"—the services necessary to correct or ameliorate a patient's illness or condition.  Each of these "other" considerations is also highly impractical and fraught with uncertainties.  The injunctions may force the Department to engage in subjective and sensitive value judgments about caregivers' lifestyle choices and other personal decisions regarding the use of their time.  The district court would require the Department to consider

---

[6] At the hearing, the Department argued that an analysis of a caregivers' personal pursuits bearing on their availability should not "enter into" a determination of a patient's medical need.  Doc. 9 at 19.  A caregiver's personal pursuits are not appropriate or relevant to a determination of medical necessity for a patient.  Doc. 9 at 19.  The district court, at the conclusion of the parties' arguments, erroneously characterized the Department's position as the opposite and demanded that the Department provide evidence of such personal activities in the future.  Doc. 19 at 33–34.  The district court's admonishment opens a caregiver's personal pursuits a necessary line of inquiry and shifts the focus away from the patient.

caregivers' work schedules (and to potentially approve additional nursing services on that basis), but it is unclear whether this consideration should extend only to mandatory work hours required by an employer or also to voluntary work commitments (e.g., a caregiver's agreement to cover extra shifts for a co-worker as a personal favor). The district court requires the Department to consider a caregiver's "care for other dependents," but it is unclear specifically who may be included in that class or what may satisfy this requirement. Unresolved is whether the Department is required to consider only basic and routine care for *other* dependents (i.e., the time spent on dressing, meal preparation, schooling, etc., for children), or whether the Department must also consider and approve additional nursing hours so parents may, for example, attend a high-schooler's extra-curricular activities or shuttle an elder dependent to doctors' appointments. Of course, no court nor the Department should have to consider these essentially unanswerable questions in this context—the law simply does not require it.

This Court has recognized that it is within the Department's discretion to set "reasonable standards for the terms 'necessary' and 'medical necessity' ... and [the Department] has 'broad discretion ... to adopt standards for determining the extent of

medical assistance," so long as the standards are reasonable and consistent with the Medicaid Act. *M.H.*, 111 F.4th at 1309. The Department has reasonably determined that the work commitments, sleep patterns, and other concerns focused on L.W.'s parents (or *anyone* aside from L.W.) do not factor into what is medically necessary to correct or ameliorate *L.W.'s* condition. The district court's injunction encroaches upon and undermines the Department's discretionary authority established in the Medicaid Act, and this Court should reverse.

**3.** As a final note, the district court should not even have heard this case. The Medicaid Act requires State plans to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." 42 U.S.C. § 1396a(3). And even though the statute does not use the term "exhaustion," this mandatory administrative appeal process makes no sense if it is optional.

"Where statutes … are silent" about exhaustion, "courts decide whether to require issue exhaustion based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Carr v. Saul*, 593 U.S. 83, 88 (2021) (quotation omitted). Here, as required, the Department has an administrative process through which Ward could have challenged

31

the Department's denial of additional skilled nursing services. *See* O.C.G.A. § 49-4-153(b)(1).  Yet Ward chose to skip this process and instead went straight to federal court.  *See* Doc. 1.

This is precisely the sort of situation in which "[p]rudential issue exhaustion" applies.  *Sandoz Inc. v. Becerra*, 57 F.4th 272, 278 (D.C. Cir. 2023).  Georgia's appeal process is adversarial, it is governed by extensive rules, *see* Ga. Comp. R. & Regs. § 616-1-2-.01, et seq., and Ward would have the burden of proof, *id.* at § 616-1-2-.07(1)(d).

The only sensible reading of the Medicaid Act is that Ward was required to present her dispute in the State's administrative forum before she filed suit.  That is, even if "exhaustion" is not expressly required, it is nevertheless "of intentional congressional design."  *FDIC v. Scott*, 125 F.3d 254, 258 (5th Cir. 1997).  For this reason, her complaint is "premature."  *Linfors v. United States*, 673 F.2d 332, 334 (11th Cir. 1982) (per curiam).

And practically, if Ward's specific challenge—that L.W. should receive 100 hours per week instead of 21—can bypass the statutorily mandated State administrative appeal process, no limiting principle would stop a similar lawsuit when the disagreement is far less pronounced (for example, when the State authorizes 21 hours and the patient seeks 22 hours).  This is

precisely the sort of dispute that administrative forums are designed to resolve, and § 1396a(3) must require exhaustion of Ward's claim before she may proceed to federal court.

### B. L.W. will not suffer an irreparable injury without the injunction.

The district court erred when it determined that "L.W. has shown irreparable harm" because his "treating physician has documented his need for private duty nursing services to manage his many complex care needs and to keep him healthy." Doc. 13 at 9.

A preliminary injunction is an extraordinary and drastic remedy. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983). It is intended to maintain the status quo. *See Ass'n of Gen. Contractors*, 896 F.2d at 1284. Here, however, in one paragraph, the district court concluded that without an immediate fivefold increase in state-provided at-home skilled nursing services, "while [L.W.'s] parents are working and sleeping, L.W.'s health and well-being are in jeopardy." Doc. 13 at 9.

But this again ignores the fact that a disagreement as to the amount of nursing care L.W. requires is no basis for a claim that Georgia violated the Medicaid Act. *See M.H.*, 111 F.4th at 1309. Just because "it might be preferable for any patient to receive

additional care from a professional nurse," it remains "rational" for the State to put reasonable restrictions on how much care it funds. *Id.* at 1310–11.

Moreover, the district court put the cart before the horse, as "[t]he chief function of a preliminary injunction is to *preserve the status quo* until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Att'y Gen. of Ala.*, 957 F.3d 1171, 1178–79 (11th Cir. 2020) (emphasis added) (quotation omitted). Here, the status quo is the 21 hours per week that Alliant already approved and that L.W. had been receiving without issue. Expanding L.W.'s care to 100 hours per week dramatically *upset* that status quo. The district court ignored that "[o]nly in rare instances is the issuance of a mandatory preliminary injunction proper," and did via preliminary injunction everything L.W. could have hoped to achieve had he successfully litigated his case to completion. *Cable Holdings of Battlefield, Inc. v. Cooke*, 764 F.2d 1466, 1474 (11th Cir. 1985) (quotation omitted).

L.W. received 21 hours of care per week for more than one year before the district court's order. *See generally* Doc. 6-1. His condition remained stable over a long period of time with the 21 hours of skilled nursing care the Department had authorized. Doc. 6-1 at ¶¶ 9, 13. Early and periodic screening, diagnostic, and

treatment requires the Department to provide certain services to "correct or ameliorate" an illness and condition, and to "ameliorate" a condition means to "*maintain* or improve" it.  Doc. 2-1 at 12 (emphasis added).  Where a patient's condition is stable and unchanged, the condition is, by definition, ameliorated.  Twenty-one hours (the status quo) was thus sufficient to correct or ameliorate L.W.'s condition.  Doc. 6-1, ¶ 13.  The district court's injunction disrupted the status quo without reason.

### C.  A preliminary injunction is adverse to the public interest.

Finally, the preliminary injunction is adverse to the public interest.  The district court determined that "a preliminary injunction will serve the public interest in upholding the law and ensuring this little boy receives the necessary medical care to which he is entitled under the Medicaid Act."  Doc. 13 at 10.  But the injunction does none of this.  It does not uphold the law for all the reasons listed above regarding why L.W. cannot succeed on the merits.  And it erroneously equates the medical care to which L.W. "is entitled under the Medicaid Act" with "whatever L.W.'s treating physician recommends."  In fact, the Medicaid Act does not specify how many hours L.W. is entitled to receive and the district court was wrong to make this determination itself rather

than evaluate "the sufficiency of [Georgia's] process." *M.H.*, 111 F.4th at 1310.

Notably, *M.H.* vacated permanent injunctions that were imposed by the district court at summary judgment. *Id.* at 1312. The district court was wrong in *M.H.*, but it is doubly wrong here, where its errors occurred at the earliest possible stage and short-circuited the entire litigation process in doing so. The preliminary injunction here harms the State, as it imposes extralegal requirements on the State as it administers a complex scheme to fairly provide Medicaid services to eligible persons throughout Georgia. *Cf., e.g.*, *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)); *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted [statutes] clearly inflicts irreparable harm on the State."). Here, the district court took drastic measures by ordering the State to quintuple the skilled nursing care L.W. receives. The preliminary injunction is well outside the norm, injures the State and the public, and demands reversal.

36

**II.  The district court failed to consider whether, and to what extent, security was required under Rule 65(c).**

The district court also abused its discretion by failing to consider the requirement for security under Rule 65(c) when issuing a preliminary injunction.  Federal Rule of Civil Procedure 65(c) provides that a court issuing a preliminary injunction or temporary restraining order must require the movant to provide security, typically in the form of a bond, to cover potential costs and damages incurred by a party wrongfully enjoined or restrained.

Even though the district court may ultimately "elect to require no security at all," *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005), it is not relieved of the requirement to at least *consider* the issue and exercise its discretion in determining whether to require security.  Specifically, Rules 52(a)(2) and 65(d) require the district court to state findings of fact and conclusions of law that support its decision.

The Department showed that an injunction increasing L.W.'s skilled nursing hours from 21 per week to 100 would increase the expense to Medicaid by $3,235.84 *per week* so long as the case remained pending.  Doc. 6 at 10.  Thus, the Department requested that Ward be required to post bond or otherwise provide security

for $64,716.80 should her motion be granted.  The security requested is the sum of the additional Medicaid funds that the Department expected to pay out over a period of just 20 weeks.[7]

The district court abused its discretion by failing to even consider whether to require security upon the issuance of a preliminary injunction.  Nothing in the record provides any explanation for the district court's failure to require or even address the issue of security.  Thus, the district court abused its discretion by failing to consider or discuss the issue or exercise its discretion when it issued the injunction which prohibits any "meaningful appellate review."  *Cox Enters., Inc.,* 510 F.3d at 1360.

---

[7]  The district court's injunction entered on July 30, 2024, has already been in effect for almost 17 weeks and the case is far from resolved.  This demonstrates the reasonableness of the request for minimal security covering a 20-week period.

# CONCLUSION

For the reasons set out above, this Court should vacate the district court's preliminary injunction and remand the case with instructions to dismiss L.W.'s complaint.

Respectfully submitted.

|  |  |
|---|---|
|  | /s/ *Gary V. Stiner, Jr.* |
| Gary V. Stiner, Jr. | Christopher M. Carr |
| *Special Ass't Attorney General* | *Attorney General of Georgia* |
| Oldenburg & Stiner, P.C. | Bryan K. Webb |
| 2004 Commerce Drive North | *Deputy Attorney General* |
| Suite 200 | Jason S. Naunas |
| Peachtree City, Georgia 30269 | *Senior Ass't Attorney General* |
| (770) 632-9500 | Michelle W. LeGrande |
| gstiner@oldenburgstiner.com | *Senior Ass't Attorney General* |
|  | Joycelyn R. Curry |
|  | *Ass't Attorney General* |
|  |  |
|  | Office of the Georgia |
|  |   Attorney General |
|  | 40 Capitol Square, SW |
|  | Atlanta, Georgia 30334 |
|  |  |
|  | *Counsel for Defendant-Appellant* |

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 8822 words as counted by the word-processing system used to prepare the document.

/s/ *Gary V. Stiner, Jr.*
Gary V. Stiner, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Gary V. Stiner, Jr.*
Gary V. Stiner, Jr.